**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

Southern District of New York
Jennifer L. Brown
*Attorney-in-Charge*

May 30, 2023

By ECF

Honorable Jennifer L. Rochon
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

**Re:  United States v. William Pichardo, 23 Cr. 48 (JLR)**

Dear Judge Rochon:

    I write on behalf of William Pichardo in advance of his June 13, 2023 sentencing, following his guilty plea to one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). William has accepted full responsibility for possessing a handgun in his car in the Bronx in September 2022. Though he did not use the gun in any way, and though he had instead obtained it just a week prior in order to feel protected in his dangerous Bronx neighborhood, he knows that there was no valid excuse for having it. He regrets his conduct very much.

    William faces a Guidelines range of 18 to 24 months,[1] but the Court should sentence him to time served, which will be three months in custody by the time of sentencing, and three years' supervised release. As will be shown below, he is remorseful and deterred. He has taken his arrest and recent imprisonment under the harsh conditions of the MDC as an opportunity to take stock of his life. Prior to this case he had worked hard to overcome a series of difficulties including his abandonment by a drug-addicted mother at his birth, his own struggles with substance abuse in later years, and stretches of incarceration during his teens and 20s. He has accomplished many impressive things, including establishing a solid work history and, prior to this case, had managed to stay out of trouble after his latest release from prison in 2011. Now, about to turn 37 years old, he is anxious to return home and build on the good progress he had achieved over the last decade.

---

[1] At the time of this submission, only the initial-disclosure presentence report, dated May 10, 2023, has issued. ECF No. 21. We have no objections to that report.

Honorable Jennifer L. Rochon  May 30, 2023
United States District Judge  Page 2 of 8

Re:  United States v. William Pichardo
     23 Cr. 48 (JLR)

**Sentencing law**

As the Court knows, the Guidelines range is but one of many factors set forth in 18 U.S.C. § 3553(a) that a district court is to consider when imposing sentence. *See generally United States v. Booker*, 543 U.S. 220 (2005). "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). Sentencing necessarily involves an analysis of a complicated mix of factors, not a blind adherence to the Guidelines; a sentencing court therefore "must make an individual assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007).

The overarching command of § 3553(a) is that sentences should be "sufficient, but not greater than necessary," to achieve the basic goals of retribution, deterrence, and rehabilitation. To arrive at such a sentence, district courts are directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the offender; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the kinds of sentences available; (4) the Guidelines range and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution. *See* § 3553(a).

At bottom, a sentencing court "has broad latitude to 'impose either a Guidelines sentence or a non-Guidelines sentence.'" *United States v. Rigas*, 583 F.3d 108, 114 (2d Cir. 2009) (citation omitted). In fact, the majority of federal sentences now fall outside the pertinent Guidelines range. The U.S. Sentencing Commission's preliminary report for 2023 found that within-Guidelines sentences were imposed in only 42.2% of cases nationally, and just 18.3% of cases in SDNY. *See* U.S. Sent'g Comm'n, *Quarterly Data Report*, at 11, 14, *available at* https://shorturl.at/avBFN. Our requested below-Guidelines sentence is therefore well within national and district norms.

| | |
|---|---|
| Honorable Jennifer L. Rochon | May 30, 2023 |
| United States District Judge | Page 3 of 8 |

Re:  United States v. William Pichardo
     23 Cr. 48 (JLR)

**The Court should impose a sentence of time served (three months) with three years' supervised release.**

     Guidelines range aside, the remaining § 3553(a) factors support our requested sentence of time served—which will be three months by the time of sentencing—with three years' supervised release. That sentence would be "sufficient, but not greater than necessary," to accomplish the goals of sentencing. We discuss the most pertinent § 3553(a) factors below.

     *William's history and characteristics.* William Pichardo was born in 1986 and will be 37 when he is sentenced. His mother was addicted to crack at the time of his birth and was incapable of raising him; he in fact does not recall meeting her until much later in life. One day, when he was 17, he was socializing with friends at a fried chicken shop when a bedraggled woman—a drug addict he had seen around the neighborhood—approached him and told him she was his mother. She was obviously still in the throes of a serious drug addiction, and her revelation shook and embarrassed him. Later, however, they would begin to foster a relationship with one another. In recent years, his mother, Estrella Velez, has gotten clean and found work with the Parks Department, and William has grown close to her. She writes of getting sober and reconnecting with her son: "It was a huge wakeup call that I needed to be there for my children, so I made the decision to get sober and try to be there for William and make up for the years I spent out of his life." Letter of Estrella Velez (Ex. A).

     With his mother lost to drugs, William was raised instead by the man he considers his father, Guillermo Pichardo, and Guillermo's mother, Antonia Pichardo. William grew up believing that Guillermo was his biological father, but when he about 30 years old learned this was not true. At that time, Antonia had recently passed away, and, in the wake of her death, William received a Facebook request from a man named Luis Miranda, who informed William that he was his father. The revelation rocked William. Though he would have some minimal contact with Luis prior to Luis's death, William always has and always will consider Guillermo his "true" father. Guillermo agrees, writing, "[H]e's been my son in every way except for blood." Letter of Guillermo Pichardo (Ex. B).

     When he was growing up, William's family was close-knit. He was raised alongside his cousin, David Cerda, and, later, a younger sister, Johanna Pichardo. The family attended church regularly. But, economically, times were difficult. Antonia earned a meager salary cleaning offices at Columbia University and so supplemented her income with food stamps

Honorable Jennifer L. Rochon  May 30, 2023
United States District Judge  Page 4 of 8

Re:  United States v. William Pichardo
     23 Cr. 48 (JLR)

and donations from her church (she was a devout Catholic). She always made sure the children had enough to eat, however. Things turned even more difficult for the family when Antonia suffered an aneurism when William was just 10. Antonia was unable to work and so William was sent to live with extended family in the Dominican Republic. He remained there for a pair of years, returning to New York City afterward.

    Back in New York, William found Antonia in a still-debilitated state, and ended up serving as her caretaker much of the time. David writes, "My grandma needed constant care because of the aneurysm, so we had a home attendant who stayed with her during the day. But when the home attendant wasn't there, William took on the responsibility of taking care of her even though he was just a kid. I left the house not long after so it was just him and her most of the time, and I remember how much he cared about protecting her." Letter of David Cerda (Ex. C).

    School, too, presented challenges for William. He was diagnosed with attention-deficit/hyperactivity disorder (ADHD) when he was seven, and the other children bullied him constantly because he was overweight. Later on, however, he became involved in sports—he played football and handball—and things improved.

    By his later teen years William found himself growing tired of school. Lacking adequate adult supervision at home, he began associating with unsavory characters in the neighborhood and soon found himself getting into trouble. He dropped out of school short of graduation, in 12th grade (though he would later earn his GED). Soon after, at 18, he went to state prison for a narcotics offense. Other convictions would follow in the ensuing years.

    William is not proud of his criminal past. But, prior to his current case, he had stayed out of trouble for over a decade—he was last released from prison in late 2011 and had not been arrested since. In that time he had endeavored to get his life on track. He worked a series of jobs, including working as a driver for Guillermo's company, Rogue Storm Bread Distributors, for the past 10 years. His work there was full-time when the hours were available, and part-time otherwise. He also worked at Walmart for about three years prior to the COVID-19 pandemic. Before that, he held jobs with Amazon and as a pizza delivery person.

That good work ethic is a quality William can build upon when he is released. Indeed, he is anxious to get back to work. His cousin, David, says: "William is [] a fighter and even though he's been through a lot I have seen him keep a smile on his face and keep trying to better himself in his life. He's a really hard worker … I've even seen him wear a Statue of Liberty costume and hand out flyers in Midtown because that was the only work he could find." Letter of David Cerda. His sister, Johanna, observes that, at the time of William's arrest, he was "getting serious about his own life. He was working, had his own room, bought a car, etc. It has never been easy for him to find steady employment because he had convictions so young, but he didn't give up. He's never been a lazy person." Letter of Johanna Pichardo (Ex. D). William's history and characteristics, including his ability to overcome the serious adversities he has faced, support our requested sentence.

*The nature and circumstances of the offense and just punishment.* At 11:45 in the morning on September 2, 2022, William, who was out driving just two minutes from his home in the Bronx, was pulled over by the NYPD after he committed a traffic infraction by turning without signaling. The officers determined that he was driving with a suspended license and arrested him. During a subsequent inventory search of his car, officers found a handgun under the front passenger seat. In a post-arrest interview, William confessed to possessing the gun and told the officers he had purchased it a week earlier for $1,000. He said that he had bought it for protection because his neighborhood had grown very dangerous.

William knows that there is no valid excuse for his possessing the gun. But it bears noting that he did not fire it or use it in any other way on that day or any other. Without minimizing the fact that unlawful gun possession is always a serious crime, these facts mitigate his offense and support our requested sentence.

In terms of just punishment, the Court should also consider the truly horrific conditions of confinement William has endured during his three months at the MDC and will continue to endure should he remain incarcerated. Even before the COVID-19 pandemic brought worsening conditions to area jails, MDC was long considered "among the worst [jails] in the federal system." Annie Correal et al., *'It's Cold As Hell': Inside a Brooklyn Jail's Weeklong Collapse*, N.Y. Times (Feb. 9, 2019), *available at* https://rb.gy/yrs2s. Now, although the height of the COVID-19 pandemic has passed, MDC continues to be a place of turmoil for those who remain imprisoned behind its walls. The impact of the pandemic still reverberates through the facility's day-to-day operations. Specifically, issues

Honorable Jennifer L. Rochon  May 30, 2023
United States District Judge  Page 6 of 8

Re:  United States v. William Pichardo
     23 Cr. 48 (JLR)

of insufficient staff and poor management cause unnecessarily dangerous conditions and near-constant lockdowns. William has himself been locked down for long stretches of time, and has received inadequate medical care as just one consequence among many others.

Nor is there reason to believe that things will improve if William is ultimately designated to a different location to serve his sentence. Incarceration across *all* BOP facilities has been brutal since the COVID-19 pandemic, as staffing has been severely depleted, facility-wide lockdowns have become routine, and programming has been eviscerated. *See e.g.*, Glenn Thrush, *Short on Staff, Prisons Enlist Teachers and Case Managers as Guards*, N.Y. Times (May 1, 2023) (describing a "chronically troubled" BOP where 21% percent of open correction officer positions remain unfilled, forcing educational and vocational aides to serve as guards, at the expense of positive programming), *available at* https://shorturl.at/eDGJX. These problems appear to be permanent. DOJ's Office of the Inspector General has highlighted staffing shortages as a major issue for the BOP in its annual reports dating back to 2015. *See* DOJ OIG, *Capstone Review of the Federal Bureau of Prisons' Response to the Coronavirus Disease 2019 Pandemic* (March 2023), at 44 & n.69–70, available at https://shorturl.at/dEO79. The intolerable conditions of confinement William has endured, and will continue to endure if not released, support our requested time-served sentence.

*Incapacitation and deterrence.* As for incapacitation and specific deterrence, William is remorseful, chastened, and committed to remaining law-abiding in the future. He understands that there is no excuse whatsoever for his possessing a firearm, and has vowed never to do so again. He need not remain incarcerated to protect the public.

As for general deterrence, the Court should not overlook William's good qualities solely in order to "send a message" to others. That is, he should not be sacrificed for a principle of general deterrence that is difficult, if not impossible, to quantify. Vast amounts of research on general deterrence show that the chance of being arrested—that is, "caught"—is a substantially more powerful deterrent than the severity of punishment. *See, e.g.*, *United States v. Browning*, 2021 WL 795725, at *5 (E.D. Mich. Mar. 2, 2021) ("In terms of both specific and general deterrence, there is overwhelming evidence in the scientific literature that the *certainty* of being caught is a vastly more powerful deterrent than the severity of the punishment.") (cleaned up); *United States v. Lawrence*, 254 F. Supp. 3d 441, 444 (E.D.N.Y. 2017) (accepting expert testimony that "[m]ost of the studies agree that

Honorable Jennifer L. Rochon  May 30, 2023
United States District Judge  Page 7 of 8

Re:  United States v. William Pichardo
     23 Cr. 48 (JLR)

there is very little deterrent effect associated with lengthy [] punishment"); *see also* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013) ("[T]here is little evidence of a [] deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased [by longer sentences]."). At bottom, general deterrence is served by making arrests and convicting defendants of crimes that, regardless of jail sentences, cause severe and debilitating real-life consequences. The general-deterrence factor accordingly does not compel a lengthy sentence.

*The need to provide effective treatment.* This factor plainly supports our requested sentence given William's struggles with opioid addiction and marijuana use. At the time of his arrest, he had been taking Percocet and Oxycontin without a prescription and smoking marijuana daily. And though he was able to stop taking the pills after his arrest, he continued to smoke marijuana. This is a drug problem that would be best addressed through mandated drug treatment while on supervised release, not incarceration.

*The need to avoid unwarranted sentence disparities.* Finally, should the Court accept the defense's recommended sentence, it would not create an unwarranted sentence disparity. In 2022, courts in this District imposed a sentence in 144 firearm cases. *See* U.S. Sent'g Comm'n, *Statistical Information Packet, Fiscal Year 2022*, at 16, *available at* https://shorturl.at/kmLSU. In those cases, 63.2% of defendants were sentenced below their advisory Guideline range. *Id.* Here, a sentence below the Guideline range, including a sentence of time served, would be completely in-line with district norms, as just a small sampling of § 922(g)(1) sentences confirm. *See, e.g., United States v. Nivar*, 19 Cr. 902 (S.D.N.Y. Jul. 29, 2021) (Torres, J.) (sentencing defendant with Guideline range of 33 to 41 months to time served (less than six months in prison)); *United States v. Garcia*, 18 Cr. 178 (S.D.N.Y. Apr. 17, 2019) (Ramos, J.) (sentencing defendant with Guideline range of 24 to 30 months to time served (zero months in prison)); *United States v. Artis*, 15 Cr. 865 (S.D.N.Y. Apr. 21, 2017) (Carter, J.) (sentencing defendant with Guidelines range of 27 to 33 months to time served (zero months in prison)); *United States v. Mouzon*, 16 Cr. 284 (S.D.N.Y. Mar. 27, 2017) (McMahon, J.) (sentencing defendant with Guideline range of 30 to 37 months to time served (zero months in prison)); *United States v. Robinson*, 16 Cr 235 (S.D.N.Y. Feb. 10, 2017) (sentencing defendant with Guideline range of 15 to 21 months to time served (less than three months in prison)).

| | |
|---|---|
| Honorable Jennifer L. Rochon | May 30, 2023 |
| United States District Judge | Page 8 of 8 |

Re:  United States v. William Pichardo
     23 Cr. 48 (JLR)

—

In conclusion, William is anxious to leave jail behind, live a healthy, sober, and law-abiding lifestyle, and return to work. His father, Guillermo, says he will do his best to find William a job when he is released: "He used to work for me as a driver for my pastry and bread delivery company, and even though he will need to work his way up to driver again, I will do my best to find him a job working for me if he needs one." Letter of Guillermo Pichardo. For her part, his mother hopes to be able to help him find work with the Parks Department, where she is employed. No matter where he ends up, he will have the strong and loving support of his family. This, along with the support of the Probation Department while he's on supervised release, will give him a great chance of success. He has proven in the past that he can stay out of trouble and live a productive life; he looks forward to proving that he can do so once again.

For the reasons discussed, the Court should sentence William to time served and three years' supervised release.

Sincerely,

/s/ Jonathan Marvinny
Jonathan Marvinny
Assistant Federal Defender
212.417.8792
jonathan_marvinny@fd.org

cc:  Andrew Rohrbach, Esq.

# EXHIBIT A

Hon. Jennifer L. Rochon
United States Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Rochon,

My name is Estrella Velez, and I'm the mother of William Pichardo. It's been 15 years since me and my son reunited. It has been a long journey for both of us to wind up back in each other's lives, but today I can say that we are very close and our relationship is only getting stronger. I feel a lot of regret about not being there for him sooner and I know me not being there was confusing and hard for him when he was growing up. But it's like they say it's better late than never.

It's my fault that William had to grow up without a mother. When he was a child I couldn't be in his life because I had an addiction and I didn't even have my own place to stay, so you could forget about a place to raise a child. I also wanted to protect him. I didn't want him to suffer seeing his mother the way that I was. I was ashamed of myself and didn't him to feel shame as well. Everything changed when my other son was stabbed in a fight at a party over nothing and he nearly died. It was a huge wakeup call that I needed to be there for my children, so I made the decision to get sober and try to be there for William and make up for the years I spent out of his life.

There were many times along the way where I messed up, but today I am proud to say that I am 9 years sober. I did it on my own without a program, but I have helped friends get into programs when they have told me they needed help. Not every one of them was able to stick with it, but my years of living with my addiction taught me that someone has to be ready to change for themselves. I learned that everyone is chasing something, everyone wants to be happy and not be in pain. I still have to struggle like everyone else. But I made it out, so I believe that anyone can change for the better. That goes for William too. I can't make up for the years I missed, but I can do my best to be there for him now.

William is a joyful and wonderful person even though he has demons from his past. He loves spending time with his 13 year old nieces and playing games with them, showing himself to be an amazing uncle. He made mistakes when was young, but these days he stays away from the street and doesn't engage in activities like drinking or going to clubs. For years he has led a quiet life focused on work and being at home. He was doing good for so long before this case. Even though he messed up, I want to promise you that William would never harm anyone.

He is a caring person as well. Unfortunately, our family recently experienced two losses in a short period. William's grandfather passed away on April 1, 2022, and his grandmother

passed away on October 20, 2022. These losses have caused William to experience depression, as he wishes he could have spent more time with them. But when things get hard, like when my mother got sick with cancer, William was always there to support us. He has been so kind and supportive to his family throughout this hard moment.

When William was out on bail in this case, he was honest with me about what he was going through. He told me that he was sorry, that he had made a mistake, and that he knew he had to face the consequences. Even with such a negative thing happening, he emphasized the value of living in the present moment. He realizes that individuals make mistakes in life, but he also knows that it's not an excuse for himself to do the same stuff in the future. There is no better example of this quality than how he forgave me for being away for all of those years. If he can do that for me, he can do that for himself and keep moving forward.

As a mother, I am committed to supporting William when he is released. I'm currently working for the park as a CSA (Customer Service Assistant). When he was out on bail, I tried to help him secure a position there. However, due to the monitor he had, it was challenging to find suitable work. We have spoken to Kane Liliya from the Parks Department, who informed me that once William is out and has his HRA (Human Resources Administration) situation resolved, he will receive an email to start his three-day training as a pop worker. This position will last for six months, and he will also fill out a Parks application to move forward with his career.

Like for everyone else, William must to continue on his journey to lead a happy and law-abiding life. I believe he can do it, because he has shown with his words and actions that he will not let this mistake define his future. I ask for leniency in his sentence so that he can prove it to you, the court, and himself. Thank you for reading about my son.

                                                      Sincerely,
                                                      Estrella Velez

# EXHIBIT B

05/24/2023

Hon. Jennifer L. Rochon
United States Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Rochon,

I want to start off by saying my name is Guillermo Pichardo and I'm the father of William Pichardo. Though I am not his biological father, I've had him since he was 4 days old, so to me he is my son. He's made mistakes in his life, some worse than others, but at the end of the day he has a good, kind heart. I am very proud of him.

Years ago, I dated a woman named Estrella Velez. Things weren't that serious, so I was surprised when she called me after we had been broken up for months and told me that she was pregnant and that it was mine. She was having hard time in life, so my mom and I took her in. When the baby boy was born, I could tell right away that it wasn't mine. The doctor pulled me aside and said that Ms. Velez told him that she didn't want to be a mother. He also said he suspected that she might be addicted to drugs. When I heard that, I knew I had a responsibility to do something. I told Ms. Velez that if she signed over custody to me that I would raise him myself, and that's what she did. That little boy was William, and since then he's been my son in every way except for by blood. My mother and I stepped in as parents.

William was a happy-go-lucky kid when he was growing up, although he struggled in school because he couldn't focus. He was diagnosed with ADHD and prescribed medication when he was only 7 or 8. The other kids would also tease him because of his weight and call him names. He's always been a big boy. With everything he was going through, I made the decision not to tell him that I wasn't his biological father. I thought that telling him about his mom would upset him too much. He never asked, so I didn't say anything. He started doing better when he found football in middle school. The discipline and friends he got from playing on teams over the years were good for him, and he stopped getting picked on.

But when he was 17 or 18, everything changed. His mom tracked him down and stopped him on the street when he was with his friends and told him that she was his real mother. Shortly afterwards, she disappeared again. It was extremely confusing for him. He was never the type to complain about anything, but after that happened, I noticed that he stopped being that happy-go-lucky kid. At first, I thought maybe he was just getting more serious and growing up, but in hindsight he was going through a lot emotionally. He just wasn't acting like himself anymore.

A few years later, his biological father somehow found him on social media and reached out to him. William didn't tell me about it until much later. He said he didn't tell me because he was scared that I wouldn't want to be in his life anymore if I knew. Not even three months later, his biological father died of an overdose, which left William with even more unanswered questions about who he was. I really wish I had been honest with him sooner about where he came from, because he started going down the

wrong path in life after his biological dad died. I did it to protect him from being hurt, but the truth always comes out eventually.

William tracked down his mom and dad's family members because he wanted to understand where he came from. Unfortunately, not all of those family members were necessarily a good influence on him. He wanted to connect with his past and his biological family, but to do that he ended up getting involved in their unhealthy lifestyles. He started using drugs and getting into trouble.

But part of the reason this case is so hard on him and on me is because for a while he seemed to be doing well. He was working two jobs as a driver for Amazon and Walmart. He asked me to loan him some money so he could buy a car, and I was so proud when he diligently paid me back bit by bit. He was talking about the importance of building and maintaining his credit. I believe he was taking steps to try to manage his struggle with addiction. He matured so much.

When I talk to William now, I have faith that even though he slipped up, the growth and maturity he was showing will stick. We barely have a call where he doesn't tell me how sorry he is for letting himself and his family down (me and his siblings, not his parents). He knows now that whatever happens, I will be by his side no matter what, just like I have been since he was 4 days old. He can always count on me. When he is released, I will make sure he has a place to stay and a job. He used to work for me as a driver for my pastry and bread delivery company, and even though he will need to work his way up to driver again, I will do my best to find him a job working for me if he needs one.

Judge, through this letter I hope you can see what I see in William: a gentle giant who can overcome the bad choices he's made and succeed in society. Thank you for reading my letter.

Sincerely,<br>
Guillermo Pichardo

# EXHIBIT C

Hon. Jennifer L. Rochon
United States Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Rochon,

My name is David Cerda. William Pichardo is my cousin on his dad's side. I have known him all my life, we were born and raised together. We lived in our grandma's house and were mostly raised by her. I want to be clear that even though William has made some foolish mistakes in his life, he's really a harmless, humble, and hardworking person. Despite everything he's been through, he's a big teddy bear at heart, and I'm not just saying that because he's family.

When I was 15 or 16 and William was around 10, our grandma had an aneurysm. It was very difficult for both of us. For him it was the only mother figure he ever really knew. My grandma needed constant care because of the aneurysm, so we had a home attendant who stayed with her during the day. But when the home attendant wasn't there, William took on the responsibility of taking care of her even though he was just a kid. I left the house not long after so it was just him and her most of the time, and I remember how much he cared about protecting her.

Our grandmother eventually passed away when William was in high school, and it the first of a few sad things that happened in his life that I think he had a lot of trouble dealing with for years. Only a couple of years after our grandmother died, he learned that his mother had basically abandoned him as a baby and that his father hadn't told him the truth for his whole life. He pushed all the negativity down and didn't want to deal with it or talk about it. I think those emotions are what have made him act out in the past.

But William is also a fighter and even though he's been through a lot I have seen him keep a smile on his face and keep trying to better himself in his life. He's a really hard worker, and I've seen it myself from when we were working together at his dad's company for a while. Because he has a felony, he has been rejected from many jobs and hasn't been able to make a career for himself. But he's not a proud person despite the setbacks. I've even seen him wear a Statue of Liberty costume and hand out flyers in Midtown because that was the only work he could find.

With everything he's been through, I could see him being a negative person who feels sorry for himself for how his life has gone. But he's not that way, he's the opposite. My daughter is 10 years old and she loves him so much. He loves to spend time with her doing whatever. He would sit down with her to watch cartoons for hours. Kids can see positive energy and are drawn to that, and William is proof of that. I see him as like a big kid.

Before Covid, it seemed like he was turning a corner and doing better for himself. He was working two jobs and it seemed like his positive energy was finally turning into results for

himself. And after struggling for a while with his relationship with his mom, he was reconnected with her and starting to catch up on the lost time. He seemed like he put his troubles behind him.

But his good momentum stopped when the pandemic hit and he lost his jobs and he had trouble finding work. I think that it was the cause of him going back to making some of the same mistakes from his past. But he has shown me that he can get his act together and hold down a steady job, and he has grown so much as a man even since this case started. He still believes in people and himself.

William hasn't let this case break his spirit, and he knows that when this case is over I will be here to help him get back on his feet. I've told him that he has a place to stay with me (if he needs it) when he is released. My girlfriend also loves him, part of that is because of how good is with our daughter. She's studying to be a counselor and she used to work at Part of the Solution which is like a program for people who have felonies and need help finding jobs or other services. She's worked with plenty of people like William who are good at heart but have just made mistakes. I think she will be willing to help out in any way she can as well. I just hope you can accept his remorse and know that he will continue to work hard in order to pay for his mistakes. Thank you for reading my letter.

                                                                Sincerely,
                                                                David Cerda

# EXHIBIT D

Hon. Jennifer L. Rochon
United States Courthouse
500 Pearl Street
New York, NY 10007

Dear Judge Rochon,

My name is Johanna Pichardo, I'm Willy's younger sister by 8 years. I currently work as a delivery driver for Rogue Storm LLC, my dad's bread delivery company. Willy is a loyal and caring person who made a lot of mistakes when he was young. I was just a little kid when he started getting in trouble, so I didn't understand what he was going through.

Since I've become an adult he's opened up to me about his past, and I realized that he was suffering in silence for many years. Until the last 10 years or so we weren't that close, so I never understood why he was acting out. For a long time I couldn't see how someone I knew as a kind and protective older brother was the same person as the one who kept getting arrested and catching charges. As I've gotten older, I see that he always was the good person I know, he was just acting out due to personal issues that he didn't know how to handle.

I wish I had known more when I was younger so that I could've have been there for him, but our dad didn't tell me very much. I know that he kept things a secret because he loved me and wanted to protect me. I was just a kid after all. But ever since Willy started to open up to me, we have realized how much we actually have in common and how we can support one another.

I only learned about his mom recently. We always knew he was a little different than us because we don't look alike, but me and his brother always treated him the same. He since told me about how finding out about his mom was hurtful because he felt our dad betrayed him by telling him his mom had passed away, even though our dad said that out of a place of love. Willy's never been the type to want to discuss his problems with anyone else because he always puts others first with a smile on his face, even when he's depressed or upset.

Now that he's told me about everything, we're closer than we've ever been before. We love going to the movies and out to eat. Sometimes we just sit and talk because he's a very easy person to talk to and he always gives good advice, especially when I have relationship issues. He never judges, no matter what.

He was also getting serious about his own life. He was working, had his own room, bought a car, etc. It has never been easy for him to find steady employment because he had convictions so young, but he didn't give up. He's never been a lazy person. That's why this case took me by surprise. It felt like everything he had worked for over 10 years came crashing down, like he took 20 steps forward and then 20 steps back. But talking to him since the case I see how he still has his usual positive mentality and will keep going when the case is over.

Willy has shown me who he is as a person, so I know he will continue working hard to move forward one step at a time. When he is released I would give him anything that he needs to get back on his feet, from money, a room to stay, someone to talk to, whatever he needs. He's proof that blood doesn't make you family, a brother is a brother end of story. Thank you for reading my letter.

Sincerely,
Johanna Pichardo